
## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TENNESSEE

**Erik Zeliski,** Plaintiff (Pro Se),

v.

**Polk County, Tennessee; Eddie Cheeks, Jail Administrator, in his individual and official capacities; Callie Nelms, Administrative Assistant, in her individual and official capacities,** Defendants.

Case number 1:26-CV-124

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF (42 U.S.C. § 1983)

### I. JURISDICTION AND VENUE

This action arises under 42 U.S.C. § 1983 for violations of Plaintiff's rights under the First, Fourth, Sixth, and Fourteenth Amendments. Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343. Venue is proper because all events occurred in Polk County, Tennessee.

### II. PARTIES

Plaintiff Erik Zeliski was a pretrial detainee at Polk County Detention Center at all relevant times.

Defendant Polk County is responsible for policies, customs, training, supervision, and operation of the detention facility.

Defendant Eddie Cheeks is Jail Administrator and final policymaker for jail operations, including classification, inmate safety, grievance procedures, legal mail handling, medical response systems, and property control.

Defendant Callie Nelms is an administrative official responsible for inmate communications, grievance processing, records management, and implementation of mail, access, and classification-related policies.

Defendants Cheeks and Nelms are sued in their individual capacities for damages and in their official capacities for purposes of municipal liability and injunctive relief.

## III. FACTUAL ALLEGATIONS

Plaintiff was housed as a pretrial detainee in a mixed-custody facility housing county and TDOC inmates, including violent offenders. Defendants Cheeks and Nelms had responsibility for implementing and enforcing policies governing classification, safety, legal access, grievances, and inmate property.

### A. Legal Mail Interference (March 2026)

Jail staff, including Defendant Nelms, interfered with Plaintiff's legal mail by improperly restricting and mishandling incoming legal correspondence. Rather than applying the correct standards governing privileged legal mail, staff knowingly misapplied policies intended for outgoing inmate correspondence to Plaintiff's incoming legal mail, and enforced this improper interpretation in practice. As a result, Plaintiff's legal mail was diverted, delayed, and interfered with, undermining the confidentiality of his legal communications and restricting his ability to communicate with legal sources.

Plaintiff understood the correspondence to be clearly identifiable as legal in nature, and no procedure was followed to process the mail as privileged legal correspondence or to open it in Plaintiff's presence.

Despite actual knowledge by jail staff, including Defendant Nelms, that Plaintiff's legal mail was being improperly handled, no corrective action was taken, and the practice was permitted to continue. This ongoing conduct resulted in repeated interference with Plaintiff's legal correspondence.

As a direct result of these interferences, Plaintiff's ability to prepare, communicate, and present matters related to his ongoing legal proceedings—including his probation revocation hearing held on March 26, 2026 in Rhea County, Tennessee—was impaired, causing prejudice to his legal position. But for Defendants' interference, Plaintiff would have presented copies of witness text evidence, printed statutes, and printed emails correspondence with Cleveland, TN probation manager at the revocation hearing. That revocation is currently pending appeal.

On March 4, 2026, Plaintiff received a facility message through the kiosk system stating that incoming legal mail would not be delivered to him because it was not in postcard form. At that

time, Plaintiff was expecting large envelopes containing evidentiary materials for an upcoming legal proceeding scheduled within approximately two weeks. The sender confirmed via kiosk message that the envelopes were clearly marked "legal mail."

When Plaintiff inquired, Defendant Nelms responded that the correspondence was sent from a family member and therefore did not qualify as legal mail under facility policy, stating that only mail from courts, attorneys of record, or government officials would be treated as legal mail. Plaintiff was further instructed that any evidence should be submitted through an attorney (see Exhibit C).

On March 5, 2026, a second envelope containing legal materials was again diverted despite Plaintiff's prior notice and objection. Upon information and belief, Defendant Cheeks was aware that the correspondence was legal in nature, yet it was again withheld and not delivered to Plaintiff or opened in his presence.

### B. Library and Reading Material Deprivation (Oct 2025–Feb 2026)

Defendants removed or confiscated books from housing units and issued a facility message stating all books were "contraband," without written policy provided.

Defendant Nelms directed or implemented this restriction and was notified by Plaintiff of the resulting deprivation.

Defendants claimed tablet access was sufficient, but only approximately 4 tablets were available for 24–25 inmates, rendering access inadequate and impractical.

Plaintiff notified Defendant Nelms in writing that the confiscation of books and lack of functional access to tablets deprived him of meaningful access to reading and legal materials. Defendant Nelms responded that tablets would not be individually assigned and asserted that the facility met applicable standards, thereby confirming that the limited tablet access was an intentional policy rather than a temporary condition. Despite Plaintiff's complaints regarding lack of access and resulting harm, no corrective action was taken.

### C. Grievance and Legal Access Failures (Jan 2026)

On January 6, 2026, Plaintiff submitted a written grievance stating that on January 5, 2026, he was denied access to legal assistance by Supervisor Kirkpatrick, who told Plaintiff, "Have your attorney print that out," when Plaintiff requested help obtaining documents related to the status of his case. Plaintiff referenced the inmate handbook, which states that correctional staff have access to computers that may be used to assist inmates with legal matters. At the time, Plaintiff was preparing for trial within approximately two months and requested assistance printing materials necessary for his defense

In the same grievance, Plaintiff also inquired about access to confidential attorney-client telephone communications that would not be recorded or monitored.

The grievance was received and signed by correctional staff, and Plaintiff retained a copy prior to submission (See Exhibit B). Despite being properly submitted and acknowledged, Plaintiff received no response. No investigation, decision, or follow-up was provided from Defendant Nelms, Defendant Cheeks, or any jail staff.

This lack of response and denial of assistance limited Plaintiff's ability to obtain and review materials necessary for his defense in advance of his pending legal proceedings.

Plaintiff requested copies from Defendant Nelms, but was not provided copies, receipts, or tracking of submitted grievances, and had no way to confirm whether grievances were processed or reviewed.

This incident was representative of a broader pattern in which grievances were accepted but not processed, returned, or tracked, leaving Plaintiff without any meaningful administrative remedy.

### D. Attorney Communication Interference (March 2026)

On March 18, 2026, Plaintiff submitted a written request to Defendant Nelms seeking a confidential, unrecorded attorney-client telephone call. Plaintiff explained that on March 10, 2026, he had asked Corrections Officer Robbie Hicks about making a private call to an attorney and was advised that submitting a request to Defendant Nelms was the proper procedure. Plaintiff further noted that the phones in C-Pod indicated that all calls were recorded and did not provide any option for confidential attorney communication.

Defendant Nelms responded that Plaintiff would need to provide the name and phone number of his attorney and stated that the court had a public defender listed as attorney of record, whose office could be contacted through a non-recorded call. In response, on March 24, 2026, Plaintiff provided the contact information for Attorney Howard Upchurch and reiterated that he had been attempting for approximately two weeks to obtain a private call. Plaintiff again explained that the available phone system did not provide any option for an unrecorded call and requested clarification on how such access was "set up," particularly in light of his impending transfer to Rhea County.

No further response was provided, and Plaintiff was not afforded a confidential attorney-client communication. Despite Plaintiff's repeated requests and provision of the required information, Defendant Nelms failed to take corrective action or provide a means for private legal communication, demonstrating deliberate indifference to Plaintiff's right to consult with counsel.

### E. Hygiene and Conditions (June 2025–Feb 2026)

On December 22, 2025, Plaintiff submitted a written complaint to Defendant Nelms regarding a reduction in toilet paper distribution that had been in effect since November 2025. Plaintiff reported that guards had reduced the supply by approximately fifty percent, creating unsanitary conditions and forcing inmates to repeatedly request additional toilet paper. Plaintiff further stated that it was both humiliating to continually ask for basic hygiene necessities and unsanitary when such requests were denied.

Plaintiff had previously requested additional toilet paper from Supervisors Crago and Kirkpatrick and was denied, being told that administration had issued strict orders not to distribute additional supplies upon request. Plaintiff referenced applicable Tennessee Corrections Institute standards requiring that inmates be provided access to basic hygiene.

In response, Defendant Nelms confirmed that toilet paper distribution was limited to one roll per week, stating that the restriction was imposed because supplies were being used for purposes other than hygiene. Despite being placed on notice that the policy resulted in unsanitary conditions, Defendant Nelms took no corrective action and continued to enforce the restriction. As a result, Plaintiff was at times left without adequate toilet paper for basic hygiene needs.

**Temperature / Environmental Conditions**

In June 2025, Plaintiff submitted a grievance to Defendant Cheeks reporting that he was being exposed to extreme high-temperature conditions inside his cell during the later part of the day. Plaintiff described excessive heat, including sweating while sitting still and difficulty sleeping due to the conditions.

Defendant Cheeks acknowledged that a facility air-conditioning compressor was broken and stated that inmates would have to share a fan with other housing units. As a temporary measure, a fan was placed in the day room; however, this provided little to no relief to inmates confined in locked cells. At times, cell doors were left open in an attempt to circulate air, further demonstrating the severity of the heat conditions.

Plaintiff requested that the temperature inside his cell be measured to document the conditions, but this request was ignored. The excessive heat conditions persisted throughout the summer months. Plaintiff ultimately submitted written correspondence to the Tennessee Corrections Institute (TCI), attaching his grievance and reporting the ongoing exposure to unsafe temperatures.

In early November 2025, the opposite condition occurred, with Plaintiff being exposed to excessively cold temperatures inside his cell, at times below 65 degrees. Plaintiff requested that the window area be sealed to prevent cold air intrusion, but Supervisor Cindy responded that "Eddie says you guys just pick the caulking out," and no corrective action was taken. Plaintiff

also requested an additional blanket due to the cold conditions, but Defendant Nelms denied the request, stating that Plaintiff had already been issued a blanket.

Despite repeated complaints and requests for relief, Defendants were aware of and failed to adequately address both the extreme heat and cold conditions, subjecting Plaintiff to prolonged exposure to unsafe environmental conditions.

**Facility System failure**

In February 2026, at approximately 4:00 p.m., the detention facility experienced a power outage related to a downed power line in the surrounding area. During the outage, the facility's backup generator failed to activate, resulting in a complete loss of operational systems, including electronic door controls, cameras, radios, in-cell communication systems, electricity, and climate control.

As a result, staff were unable to access secured housing units or effectively communicate within the facility. A corrections officer in central control was temporarily confined without access to functional cameras or radios, and staff were unable to operate secured doors even when attempting to use physical keys, which did not function under the circumstances.

During this period, an inmate in another housing unit fell down a flight of stairs and sustained injuries requiring hospital transport. The outage lasted approximately forty-five minutes, during which the facility was unable to maintain normal safety and emergency response capabilities.

While the initial outage was caused by an external power event, the failure of the facility's backup systems and inability to respond to emergencies exposed inmates, including Plaintiff, to a substantial risk of harm.

These incidents were not isolated inconveniences, but reflected ongoing and known deficiencies in the facility's environmental and operational systems, which Defendants failed to adequately repair or correct despite repeated notice.

**F. Custody Record Errors (May 2025–Mar 2026)**

Plaintiff was assigned duplicate inmate identification numbers, causing inaccurate custody and legal records.

Defendants' failure to maintain accessible and accurate grievance records deprived Plaintiff of any meaningful ability to verify, track, or rely upon the grievance process.

Defendant Nelms was notified repeatedly but failed to correct the errors.

**G. Failure to Protect – High-Risk**

Plaintiff was classified as a low-risk, non-violent inmate. In or around November 2025, correctional staff moved Plaintiff from cell C101 to cell C112. This move was made to allow additional inmates from booking to be housed in Plaintiff's prior cell, reflecting a decision driven by capacity needs rather than appropriate classification or safety considerations.

As a result, Plaintiff was reassigned into a housing unit containing higher-risk inmates, including inmate Shannon Stewart. Stewart had a well-documented history of violent behavior and disciplinary issues, including multiple incidents involving fighting, threats, and destruction of property. Stewart had been incarcerated at the facility for an extended period and was known to Defendant Cheeks and jail administration. Due to his history of violence, Stewart was not housed in general population despite being technically classified for such placement, but instead was placed in C-Pod under administrative segregation.

Despite Stewart's known violent history and administrative segregation status, Defendants Cheeks and Nelms placed or permitted Plaintiff—a low-risk inmate with no history of violence—to be housed in proximity to Stewart, exposing Plaintiff to a substantially increased risk of harm. Shortly after being housed in the unit, Stewart showed Plaintiff documentation reflecting approximately fifteen disciplinary actions involving violent conduct, further demonstrating the risk he posed.

Stewart's behavior, combined with his access to Plaintiff's personal correspondence, caused Plaintiff to fear retaliation, limiting his ability to safely report concerns or seek protective measures without risking escalation.

These unsafe conditions were compounded by broader security and operational failures within the facility. Due to malfunctioning air-conditioning and related system deficiencies, cell doors were at times left unsecured, allowing inmate movement without proper control or supervision.

Under these conditions, inmate Derek Rowland, a convicted second-degree murder offender and known security risk, was able to enter Plaintiff's housing area without authorization and violently assault Plaintiff's cellmate, causing severe injury. Plaintiff intervened in an attempt to stop the assault and, in doing so, sustained injury to his left arm.

The circumstances allowing Rowland to access the housing unit—including unsecured doors, inadequate supervision, and failure to control inmate movement—created a substantial risk of serious harm. Upon information and belief, Defendants were aware of these ongoing security deficiencies but failed to take reasonable measures to correct them.

7

Following the incident, Plaintiff reported his injury and sought medical attention; however, the facility's response further reflected disregard for inmate safety and well-being. Despite visible swelling and injury, Plaintiff received only minimal treatment and no meaningful evaluation or follow-up care.

Defendants knew or should have known that the combination of improper housing decisions, known violent inmates, and ongoing security failures created a substantial risk of serious harm to Plaintiff. Nevertheless, Defendants failed to take reasonable measures to protect Plaintiff from these risks, demonstrating deliberate indifference to his safety in violation of his constitutional rights.

No incident report or follow-up inquiry was conducted with Plaintiff regarding the assault.

## H. Deliberate Indifference to serious medical needs (June 2025)

Following the assault described above, Plaintiff submitted a sick call request through the kiosk stating "assess left arm injury." Plaintiff's left arm was visibly swollen and bruised. A nurse briefly assessed the injury while passing medications and provided only Tylenol, without conducting a formal evaluation, ordering diagnostic testing, arranging follow-up care, or interviewing Plaintiff regarding the assault or the extent of his injuries.

Plaintiff continues to experience symptoms consistent with nerve involvement affecting motor function in his left hand. A nurse practitioner has since diagnosed the condition as ulnar nerve impingement, and Plaintiff is currently undergoing further evaluation, including X-rays and nerve conduction testing.

Despite the obvious nature of Plaintiff's injury and the circumstances surrounding the assault, Defendants failed to provide adequate medical care or ensure appropriate evaluation and treatment, demonstrating deliberate indifference to Plaintiff's serious medical needs and safety.

No formal medical evaluation, documentation, or follow-up care was scheduled at the time of Plaintiff's initial complaint.

## I. Property Deprivation – Vehicle Tow (April–May 2025)

Plaintiff was taken into custody while his truck remained lawfully parked at the Sheriff's Office.

At the time of Plaintiff's booking, corrections staff were aware that Plaintiff's vehicle was located in the jail parking lot. Plaintiff informed staff that necessary prescription medication was inside the vehicle and granted permission for retrieval.

Corrections Officer Kendrick sought and obtained authorization from Defendant Cheeks prior to accessing the vehicle. Following that authorization, Officer Kendrick entered Plaintiff's vehicle and retrieved Plaintiff's medication.

Despite this coordinated access to Plaintiff's vehicle under supervisory approval, no documentation was created reflecting the existence, location, access, or condition of the vehicle. The vehicle was not recorded in Plaintiff's booking or property records, and no inventory, log entry, or chain-of-custody documentation was generated.

On or about May 20, 2025, Defendant Cheeks informed Plaintiff, in the presence of Officer Gary (witness), that the vehicle would be towed if not moved.

The verbal instruction to "move the vehicle or it would be towed," given to a detained individual with no ability to access or relocate the vehicle, was illusory and did not constitute meaningful notice or an opportunity to avoid deprivation.

Plaintiff was not provided any written notice, documentation, or procedure to contest or prevent the towing while in custody.

This interaction demonstrates that Defendants had actual knowledge of Plaintiff's vehicle, exercised control over it, and possessed the ability to implement procedures when desired, yet failed to maintain any record or tracking of the vehicle thereafter.

Plaintiff incurred approximately $2,200 in towing and impound costs.

**Unified Breakdown of Access to Legal Resources and Court Preparation**

During the period leading up to Plaintiff's court proceedings, Defendants maintained and enforced practices that, in combination, deprived Plaintiff of meaningful access to legal materials, communication, and the ability to prepare and present legal claims.

First, Defendants interfered with Plaintiff's ability to receive legal materials by improperly restricting and withholding incoming legal mail, including clearly marked legal correspondence containing evidentiary materials. These materials were not delivered to Plaintiff and were not processed as privileged legal mail, preventing Plaintiff from reviewing information necessary for his defense.

Second, Defendants eliminated access to physical reading and legal materials by confiscating all books from inmate housing units on or about October 24, 2025. This included general reading materials and non-Bible religious texts. Although Defendants asserted that a tablet-based system provided a substitute, that system was functionally inadequate. Approximately four to five tablets were distributed among housing units of approximately 24–25 inmates, resulting in limited,

9

inconsistent, and often unavailable access. At times, devices were not functioning properly, further reducing availability.

Third, access to the tablet-based system was not only limited but unpredictable and subject to arbitrary restriction. Tablets were collected nightly and redistributed the following day; however, staff at times withheld all tablets from an entire housing unit as a form of collective discipline based on the actions of other inmates. Plaintiff personally experienced a complete denial of access to all tablets for approximately one week in June 2025 after another inmate accessed a device in violation of disciplinary restrictions. This denial occurred despite Plaintiff's lack of involvement and rendered access to legal materials entirely unavailable during that period.

Fourth, Defendants failed to provide any meaningful alternative means of accessing legal materials or assistance. Plaintiff was denied help obtaining or printing legal documents and was not provided a functional method to retrieve or retain legal materials necessary for court preparation. The grievance system, which might otherwise serve as a mechanism to address these issues, was effectively unavailable due to lack of response, lack of documentation, and inconsistent procedures.

Fifth, Defendants failed to provide Plaintiff with any means of confidential attorney-client communication. Despite repeated requests and compliance with instructions, Plaintiff was not afforded an unmonitored telephone call with counsel, and all available communication systems were recorded. This further impaired Plaintiff's ability to prepare for court proceedings and seek legal guidance.

These combined conditions were not isolated or incidental, but operated together to create a system in which Plaintiff's access to legal resources was limited, inconsistent, and at times completely denied. The deficiencies were known to Defendants through Plaintiff's grievances and direct communications, yet no corrective action was taken.

As a direct result of these combined failures, Plaintiff was unable to reliably access legal materials or prepare filings during critical periods. In particular, during a period of complete denial of tablet access in June 2025, Plaintiff was actively attempting to prepare a motion for bond in advance of a scheduled court proceeding on July 14, 2025. Due to the lack of access to legal materials and resources, Plaintiff missed the opportunity to timely file that motion prior to the hearing and was not able to submit it until November 17, 2025, resulting in a substantial delay in seeking relief and prolonging his detention.

Defendants' actions and omissions, taken together, deprived Plaintiff of meaningful access to the courts and the ability to prepare and present legal claims.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

Plaintiff attempted to exhaust all available administrative remedies through the grievance procedures at Polk County Detention Center.

Although correctional staff would provide paper grievance forms upon request in accordance with the inmate handbook, the grievance process was not meaningfully available in practice. Once submitted to jail administration, including Defendant Nelms, grievances were not returned to Plaintiff, and no copies, receipts, or confirmation of submission were provided. Plaintiff was therefore unable to verify whether grievances were received, processed, or reviewed.

Despite applicable standards requiring that inmate records include grievances and related documentation, Plaintiff's submitted grievances were not maintained in any accessible form within his inmate records. Plaintiff specifically requested copies of grievances maintained in his file but was not provided any such documentation.

When Plaintiff sought clarification regarding the status of his grievances and access to records, Defendant Nelms advised that the "official" record of grievances was maintained through the jail kiosk system. However, the kiosk system functioned as a general messaging platform rather than a formal grievance process. Messages submitted through the kiosk were not reliably answered, were not tracked as grievances, and did not generate any confirmation, receipt, or record accessible to Plaintiff.

Plaintiff attempted to use the kiosk system to clarify whether it constituted the official grievance process, including directing inquiries to supervisory staff. These inquiries received no response. As a result, Plaintiff had no meaningful way to determine whether grievances should be submitted via paper forms or kiosk messages, and no way to confirm that any submission—through either method—was received or processed.

The grievance system further lacked any identifiable appeal or review mechanism. Plaintiff was not provided any means to challenge non-responses, escalate unresolved grievances, or seek administrative review of denied or ignored complaints.

Plaintiff's ability to utilize the grievance system was further impaired by the limitations of the kiosk system, which imposed strict time constraints and access restrictions. The system would automatically log users out after a short period and limit repeated attempts, preventing Plaintiff from submitting complete grievances or follow-up inquiries. These limitations, combined with the lack of access to the inmate handbook and grievance procedures, further rendered administrative remedies effectively unavailable.

Taken together, these deficiencies—including the absence of tracking, documentation, confirmation, and any appeal process—rendered the grievance system a dead-end process in practice. Plaintiff had no meaningful ability to pursue, verify, or complete the grievance process.

Accordingly, administrative remedies were effectively unavailable, and Plaintiff has satisfied the exhaustion requirement under 42 U.S.C. § 1997e(a).

## V. CLAIMS FOR RELIEF

### COUNT I – UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT (14th Amendment)

Plaintiff incorporates by reference all preceding paragraphs.

At all relevant times, Defendants Cheeks and Nelms were responsible for the operation of the facility and the conditions under which inmates were confined.
Plaintiff was subjected to conditions of confinement that deprived him of basic human needs, including adequate hygiene, safe environmental conditions, and reasonably safe living conditions.

Defendants implemented and enforced a policy limiting inmates to one roll of toilet paper per week, even when additional supplies were necessary for basic hygiene. Despite being placed on notice that this restriction resulted in unsanitary conditions, Defendants failed to take corrective action, and Plaintiff was at times left without adequate toilet paper for basic hygiene needs.

Notably, this toilet paper restriction was imposed only on male housing units, while female housing units were not subject to the same limitation, demonstrating that the policy was not uniformly necessary and further evidencing its arbitrary and punitive nature.

Plaintiff was also subjected to prolonged exposure to extreme temperatures. During the summer months, a known air-conditioning failure caused excessive heat within Plaintiff's cell, resulting in sweating while at rest and difficulty sleeping.

Despite acknowledging the malfunction, Defendant Cheeks failed to implement an adequate remedy. Temporary measures, such as placing a fan in a common area, did not provide relief to inmates confined in locked cells.

In contrast, during colder months, Plaintiff was exposed to low temperatures, including conditions below 65 degrees, without adequate protection. Requests for additional blankets or measures to reduce cold air exposure were denied or ignored.
These environmental conditions persisted over extended periods of time despite Defendants' knowledge and repeated notice from Plaintiff.

In addition, the facility suffered from operational and infrastructure failures that further compromised inmate safety. These included failures in climate control, malfunctioning systems affecting secured doors, and the failure of backup power systems, which resulted in the loss of essential functions such as communication, security monitoring, and controlled access within the facility.

Defendants knew or should have known that these combined conditions posed a substantial risk to inmate health and safety. Nevertheless, Defendants failed to take reasonable measures to correct these deficiencies.

These conditions persisted for weeks/months at a time and resulted in ongoing sleep deprivation, hygiene compromise, and physical discomfort beyond routine jail conditions.

Defendant Nelms was personally involved in enforcing hygiene and property distribution policies, including the limitation on toilet paper, and was directly notified of the resulting unsanitary conditions but failed to take corrective action.

Defendant Cheeks was aware of the environmental and operational deficiencies, including extreme temperatures and facility system failures, through grievances and direct reports, yet failed to implement reasonable measures to correct these conditions.
Defendants' actions and omissions constituted deliberate indifference to Plaintiff's health and safety in violation of his constitutional rights.

The conditions described herein were inconsistent with TCI standards governing inmate hygiene, environmental conditions, and facility maintenance. These standards require that inmates be provided adequate sanitation, including access to necessary hygiene supplies, and that facilities maintain safe and habitable living conditions, including appropriate temperature control and functioning infrastructure.

Defendants' enforcement of restrictive hygiene policies, combined with prolonged exposure to extreme temperatures and failures in facility systems such as climate control and backup power, reflect a departure from these recognized standards.

**COUNT II – INTERFERENCE WITH LEGAL MAIL(First and Fourteenth Amendments)**

Plaintiff incorporates by reference all preceding paragraphs.

At all relevant times, Defendants Cheeks and Nelms were responsible for implementing and enforcing policies and practices governing inmate mail, including the handling of legal correspondence.

Defendants, acting under color of state law, interfered with Plaintiff's legal mail by maintaining and enforcing practices that improperly restricted, diverted, delayed, and withheld incoming legal correspondence.

Defendants applied an improper and overly restrictive policy under which incoming mail would be treated as legal mail only if it originated from a court, attorney of record, or government official. Pursuant to this practice, Defendants refused to treat clearly identifiable legal correspondence as privileged legal mail and failed to process such mail in accordance with constitutional requirements, including opening it in Plaintiff's presence.

In or around March 2026, Plaintiff was expecting and did receive incoming correspondence containing legal materials related to pending court proceedings. The correspondence was clearly marked as legal in nature. Nevertheless, Defendants withheld and diverted the mail based on the identity of the sender rather than the nature of the contents, and refused to deliver or properly process the materials.

Plaintiff further states that prior to the March 2026 incidents, the Polk County Detention Center had previously delivered legal correspondence from the same sender under materially identical circumstances. Plaintiff retained a copy of the envelope that was successfully delivered (see Exhibit A). Despite no meaningful difference in the nature of the correspondence, labeling, or packaging, Defendants subsequently refused to deliver later mailings from that same sender. This inconsistent application demonstrates that the restriction was not a neutral or uniformly enforced policy, but rather was applied arbitrarily and without a legitimate penological basis.

This selective enforcement further demonstrates the absence of clear standards or training governing legal mail handling, resulting in unpredictable and unconstitutional interference.

Courts have recognized that correspondence may qualify as legal mail where it is clearly identifiable as legal in nature and implicates confidential legal communication, particularly where the handling of such mail interferes with an inmate's ability to prepare and present legal claims.

Defendant Nelms was personally involved in enforcing this practice by responding to Plaintiff's inquiries and affirmatively stating that such correspondence would not be treated as legal mail unless sent by an attorney of record, court, or government official. Despite Plaintiff's notice that the materials were legal in nature and necessary for his defense, Defendant Nelms took no corrective action.

Defendant Cheeks was aware of the improper handling of legal mail through facility communications and Plaintiff's complaints and failed to implement corrective measures, thereby permitting the continued interference.

Defendants' actions were not isolated incidents, but reflected an ongoing practice of improperly restricting legal mail based on sender identity rather than content, resulting in repeated interference with Plaintiff's legal correspondence.

As a result of Defendants' actions, Plaintiff was prevented from timely receiving and reviewing legal materials necessary to prepare for pending legal proceedings, including his probation-related proceedings, thereby impairing his ability to prepare and present his legal claims.

Defendants' conduct interfered with the confidentiality of legal communications and unjustifiably obstructed Plaintiff's ability to receive legal materials, in violation of Plaintiff's rights under the First and Fourteenth Amendments.

Defendants' conduct was intentional and policy-driven, not inadvertent or negligent, as demonstrated by repeated enforcement of the same improper standard despite Plaintiff's objections.

**COUNT III – DENIAL OF ACCESS TO COURTS (First and Fourteenth Amendments)**

Plaintiff incorporates by reference all preceding paragraphs.

At all relevant times, Defendants Cheeks and Nelms were responsible for implementing and maintaining policies and practices governing inmate access to legal materials, legal communication, and court-related resources.

Defendants, acting under color of state law, deprived Plaintiff of his right to meaningful access to the courts by maintaining and enforcing practices that, in combination, rendered Plaintiff's ability to prepare and pursue legal claims inadequate, unreliable, and at times completely unavailable.

These practices included, but were not limited to: (1) interference with and withholding of incoming legal mail; (2) confiscation of books and elimination of physical access to legal and reading materials; (3) reliance on a tablet- or kiosk-based system that was functionally inadequate due to limited availability, shared access among numerous inmates, and frequent device inoperability; (4) arbitrary and collective denial of all tablet or kiosk access for extended periods based on the conduct of other inmates; (5) failure to provide assistance in obtaining, printing, or retaining legal materials; and (6) failure to provide any meaningful means of confidential communication with legal counsel.

Although Defendants may contend that a kiosk-based legal library was available for limited periods each day, such access was not meaningful in practice. The system required sharing a small number of devices among approximately 24–25 inmates, resulting in limited, inconsistent, and often unavailable access. At times, devices were nonfunctional or withheld entirely. Access to the system was further rendered unreliable by the practice of collecting devices nightly and, at times, withholding all devices from an entire housing unit as a form of collective discipline, regardless of Plaintiff's individual conduct.

Defendants further impaired Plaintiff's ability to understand and comply with institutional procedures by failing to provide access to the inmate handbook and governing rules. Plaintiff was not issued a handbook during booking and was unable to obtain one through official channels. Although Defendants represented that such materials were available electronically, the tablet system did not contain the full inmate rules, and access to tablets was limited and unreliable. Plaintiff ultimately obtained partial access to the handbook only through another inmate and attempted to create a copy for personal use, which was denied.

Additionally, the kiosk system used for communication and grievances imposed strict time limitations, including automatic logouts after approximately three minutes and lockout restrictions after repeated attempts. These limitations prevented Plaintiff from submitting complete or meaningful requests and further restricted access to institutional processes.

Defendants were aware of these deficiencies through Plaintiff's written grievances and direct communications but failed to take corrective action. The grievance system itself was ineffective in practice, as Plaintiff received no meaningful responses and was not provided with copies or tracking of submissions, leaving him without a functional mechanism to address or remedy the ongoing denial of access to legal resources.

As a direct and proximate result of Defendants' actions and omissions, Plaintiff suffered actual injury to his ability to pursue nonfrivolous legal claims. First, during a period in or around June 2025 when all tablet access was denied for approximately one week as a result of a pod-wide restriction unrelated to Plaintiff's conduct, Plaintiff was actively attempting to prepare a motion for bond in advance of a scheduled court proceeding on July 14, 2025.

Due to the complete denial of access to legal materials and resources during this critical period, Plaintiff was unable to research, prepare, and submit his motion in a timely manner and missed the opportunity to have the motion considered at the scheduled hearing. Plaintiff was not able to submit the motion until November 17, 2025, resulting in a substantial delay in seeking release and prolonging his detention for several months.

Second, in March 2026, Defendants' interference with Plaintiff's legal mail and continued denial of meaningful access to legal materials further prejudiced Plaintiff in connection with his probation revocation proceedings held on March 26, 2026 in Rhea County, Tennessee. Plaintiff was prevented from receiving and reviewing evidentiary materials, including witness text messages, statutory materials, and correspondence necessary to support his defense.

As a result, Plaintiff was unable to present this evidence at the revocation hearing, causing concrete prejudice to his legal position in that proceeding.

The underlying legal matters described herein—including Plaintiff's motion for bond and defense against probation revocation—were nonfrivolous and directly implicated Plaintiff's liberty interests. Defendants' actions deprived Plaintiff of a meaningful opportunity to prepare and present these claims, thereby violating Plaintiff's constitutional right of access to the courts.

The denial of access described herein was not isolated, but resulted from ongoing practices that rendered Plaintiff's access to legal resources inconsistent, unreliable, and at times completely unavailable, thereby depriving Plaintiff of meaningful access to the courts.

The absence of any appeal or review mechanism further prevented Plaintiff from correcting or escalating ongoing denials of access to legal resources.

Defendant Nelms was personally involved in enforcing and maintaining these practices, including administering access to communication and resource systems, responding to Plaintiff's requests, and permitting pod-wide restrictions on access to legal materials.

Defendant Cheeks, as final policymaker for jail operations, was aware of the deficiencies in access to legal resources and communication systems through grievances, reports, and facility practices, yet failed to implement reasonable measures to ensure constitutionally adequate access.

Defendants' actions and omissions violated Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution.

## COUNT IV – DENIAL OF RIGHT TO COUNSEL (6th & 14th Amendments)

Plaintiff incorporates by reference all preceding paragraphs.

Defendants interfered with Plaintiff's right to communicate confidentially with legal counsel during the pendency of criminal proceedings.

Plaintiff submitted multiple requests for a confidential, unrecorded attorney-client telephone call and provided the requested attorney contact information.

Defendants failed to provide any means for Plaintiff to engage in confidential legal communication, despite knowledge that all available phone systems were recorded and did not permit private attorney-client calls.

This denial occurred during the pendency of active criminal proceedings requiring consultation regarding defense strategy and filings.

Despite Plaintiff's repeated requests and compliance with instructions, Defendants failed to take corrective action or provide access to confidential communication with counsel.

This conduct occurred while Plaintiff had pending legal proceedings and required the ability to consult with counsel regarding his defense.

These events occurred at a critical stage of ongoing criminal proceedings, including preparation for Plaintiff's probation revocation hearing, where the ability to consult confidentially with counsel was essential.

Defendant Nelms was personally involved in the denial of Plaintiff's right to counsel by receiving and responding to Plaintiff's requests for a confidential attorney-client telephone call,

requiring attorney information, and then failing to provide any mechanism for private legal communication despite Plaintiff's compliance.

Defendant Cheeks, as the final policymaker responsible for jail communication systems and inmate access procedures, permitted the continued use of phone systems that did not allow for confidential attorney-client communication and failed to ensure that constitutionally adequate alternatives were available.

These practices were also inconsistent with TCI standards concerning inmate communication and access to legal resources, which require that inmates be provided reasonable means to communicate with legal counsel. The absence of any system allowing for confidential, unmonitored attorney-client communication reflects a failure to meet basic correctional standards and further supports Defendants' deliberate indifference to Plaintiff's constitutional rights.

Defendants' actions demonstrated deliberate indifference to Plaintiff's right to counsel and violated his rights under the Sixth and Fourteenth Amendments.

## COUNT V– FAILURE TO PROTECT (CLASSIFICATION AND SUPERVISION) (14th Amendment)

Plaintiff incorporates by reference all preceding paragraphs.

Defendants Cheeks and Nelms had a duty to protect Plaintiff from a substantial risk of serious harm while in custody.

Defendants knew or should have known that Plaintiff, a low-risk inmate, was being housed in proximity to high-risk, violence-prone inmates, including Shannon Stewart, who had a well-documented history of violent behavior and was placed under administrative segregation due to safety concerns.

Defendants further knew or should have known that ongoing security failures within the facility, including unsecured cell doors and inadequate supervision, allowed uncontrolled inmate movement and created dangerous conditions.

Despite this knowledge, Defendants failed to take reasonable measures to separate inmates based on known risk classifications or to maintain secure housing conditions.

Defendants were aware, prior to the assault, that cell doors were being left unsecured due to system failures and took no corrective action.

As a direct result of these failures, on June 14, 2025, Derek Rowland, a known violent inmate, was able to access Plaintiff's housing area without authorization and assault Plaintiff's cellmate. Plaintiff was injured while attempting to intervene in the assault.

No incident report or follow-up inquiry was conducted with Plaintiff regarding the assault.

Defendant Cheeks was personally involved in classification and housing decisions and was aware of the presence of high-risk, violent inmates and ongoing security deficiencies within the facility, yet failed to take reasonable measures to ensure inmate safety.

Defendant Nelms, through her administrative role and involvement in inmate records and classification-related processes, was aware of or contributed to the conditions that resulted in Plaintiff being housed in proximity to dangerous inmates and failed to take corrective action.

Defendants' actions were also inconsistent with TCI standards governing inmate classification, supervision, and facility security. These standards require that inmates be classified and housed in a manner that reasonably protects their safety and that facilities maintain adequate supervision and control over inmate movement.

The placement of Plaintiff in proximity to known violent inmates, combined with failures in securing housing units and controlling inmate movement, reflects a departure from accepted correctional practices and supports a finding of deliberate indifference.

Defendants' actions and omissions constituted deliberate indifference to a substantial risk of serious harm, in violation of Plaintiff's constitutional rights.

## COUNT VI– DELIBERATE INDIFFERENCE TO MEDICAL NEEDS (14th Amendment)

Plaintiff incorporates by reference all preceding paragraphs.

As a result of the assault described above, Plaintiff sustained injury to his left arm, including visible swelling and bruising.

Plaintiff submitted a sick call request through the facility kiosk requesting evaluation of his injury, stating "assess left arm injury."

Despite the obvious nature of the injury and Plaintiff's request for care, medical staff provided only minimal treatment. A nurse briefly assessed Plaintiff while passing medications and provided Tylenol without conducting a meaningful evaluation, ordering diagnostic testing, or scheduling follow-up care.

No diagnostic evaluation or follow-up care was provided despite obvious signs of injury and worsening symptoms.

Plaintiff's condition persisted and worsened, including symptoms consistent with nerve involvement affecting motor function in his left hand.

Plaintiff was later evaluated by a nurse practitioner and diagnosed with ulnar nerve impingement, requiring further medical evaluation, including X-rays and nerve conduction testing.

Defendants failed to provide timely and adequate medical care in response to Plaintiff's injury and ignored the need for appropriate evaluation and treatment, demonstrating deliberate indifference to Plaintiff's serious medical needs.

Defendant Cheeks and Defendant Nelms were aware of Plaintiff's injury and the circumstances surrounding the assault through reports and requests for care, yet failed to ensure that Plaintiff received timely and adequate medical evaluation and treatment.

Defendants maintained and permitted practices that resulted in inadequate medical response to inmate injuries, including failure to provide meaningful evaluation or follow-up care.

These deficiencies were also inconsistent with TCI standards governing inmate medical care, which require that inmates receive appropriate medical evaluation and treatment and that facilities maintain procedures to ensure timely and adequate responses to medical needs.

The failure to provide meaningful evaluation or follow-up care for Plaintiff's injury reflects a departure from these recognized standards.

As a result of Defendants' actions and omissions, Plaintiff suffered unnecessary pain, delayed diagnosis, and ongoing impairment.

## COUNT VII – MUNICIPAL LIABILITY (MONELL)

Plaintiff incorporates by reference all preceding paragraphs.

Defendant Polk County is liable under 42 U.S.C. § 1983 because the constitutional violations suffered by Plaintiff were caused by policies, customs, and practices maintained by the County and implemented by its policymakers.

At all relevant times, Defendant Cheeks acted as a final policymaker for jail operations, including policies governing inmate access to legal materials, legal mail handling, communication systems, grievance procedures, inmate classification, and facility safety. Defendant Nelms implemented and enforced administrative practices consistent with those policies and customs.

The constitutional violations described herein were not isolated incidents, but were the result of widespread and persistent practices within the Polk County Detention Center, including:

(a) maintaining a system of access to legal materials that was functionally inadequate in practice, including reliance on a limited number of shared devices that did not provide consistent or meaningful access;

(b) permitting and enforcing arbitrary, pod-wide restrictions on access to legal resources, including the complete denial of tablet or kiosk access as a form of collective discipline unrelated to individual conduct;

(c) maintaining practices that improperly restricted and interfered with incoming legal mail based on sender identity rather than the legal nature of the correspondence;

(d) failing to provide any meaningful mechanism for confidential attorney-client communication;

(e) maintaining a grievance system that was ineffective and unavailable in practice, thereby preventing inmates from addressing or correcting ongoing constitutional violations;

(f) failing to implement adequate policies, training, and supervision regarding inmate classification, safety, and response to known risks of harm; and

(g) maintaining deficient medical response practices that failed to ensure timely and adequate evaluation and treatment of inmate injuries.

(h) maintaining a grievance system that lacked any mechanism for tracking, documentation, or inmate access, resulting in the effective loss or non-processing of submitted grievances.

(i) maintaining a grievance system that lacked any meaningful review or appeal mechanism, preventing correction of known deficiencies.

(k) maintaining a system in which inmate access to rules, grievances, and legal materials was dependent on a limited and restricted electronic platform that imposed time constraints and access barriers.

These practices affected multiple inmates and were not unique to Plaintiff. As evidenced by pod-wide restrictions, collective denial of access to tablets, and uniform enforcement of deficient grievance and mail practices, these conditions were applied broadly to the inmate population rather than being isolated to Plaintiff.

The foregoing practices reflect distinct but related systemic failures within Polk County Detention Center.

First, Defendants maintained formal or informal policies that were unconstitutional on their face or as applied, including the restriction of legal mail based on sender identity rather than content.

Second, Defendants maintained structural systems that were functionally inadequate, including reliance on a limited and unreliable kiosk and tablet system that did not provide meaningful access to legal materials or court resources.

Third, Defendants permitted the use of arbitrary and collective punishment practices, including pod-wide denial of access to legal resources, without regard to individual conduct.

Fourth, Defendants demonstrated a pattern of disregarding known risks to inmate health and safety, including unsanitary conditions and exposure to extreme temperatures, despite repeated notice through grievances and complaints.

These failures were not isolated incidents, but were recurring, known, and uncorrected, reflecting deliberate indifference to the constitutional rights of inmates.

These practices were so widespread and well-settled as to constitute customs or usages with the force of law.

Polk County, through its policymakers, had actual or constructive notice of these practices through inmate grievances, complaints, and the obvious and recurring nature of the deficiencies, yet failed to take corrective action.

The need for training, supervision, and policy correction was obvious, particularly with respect to legal mail handling, access to courts, confidential attorney communication, inmate safety, and medical response. Despite this, Polk County failed to implement reasonable measures to ensure compliance with constitutional requirements.

As a direct and proximate result of these policies, customs, and failures, Plaintiff was deprived of meaningful access to the courts, subjected to unsafe conditions, denied adequate medical care, and suffered physical, financial, and constitutional injury.

The policies, customs, and practices described herein were the direct and moving force behind the constitutional violations suffered by Plaintiff. The deprivation of access to legal materials, interference with legal mail, denial of confidential attorney communication, and exposure to unsafe conditions were the foreseeable and predictable result of Defendants' failure to implement constitutionally adequate policies, training, and supervision.

Accordingly, Defendant Polk County is liable under 42 U.S.C. § 1983.

**COUNT VIII– Unlawful Seizure and Deprivation of Property(Fourth and Fourteenth Amendments – 42 U.S.C. § 1983)**

At all relevant times, Defendant Eddie Cheeks, acting under color of state law as Jail Administrator of the Polk County Detention Center, caused or authorized the towing and impoundment of Plaintiff's personal vehicle from the jail parking lot.

Plaintiff's vehicle was lawfully owned and parked in the detention facility's parking area at the time of Plaintiff's arrest. The vehicle was not contraband, not evidence of a crime, and not otherwise subject to lawful seizure or forfeiture.

While Plaintiff was in custody, Defendant Cheeks came to Plaintiff's cell and asked whether a particular truck belonged to him. Upon confirmation, Defendant Cheeks stated that the vehicle "needed to be moved or it would be towed." No written notice was provided, no timeline was given, and no reasonable means were offered for Plaintiff—who was already incarcerated—to move the vehicle or arrange for its removal.

At the time of this interaction, Plaintiff was detained and unable to access his vehicle, contact assistance, or otherwise comply with the demand. Defendant Cheeks nonetheless caused or permitted the vehicle to be towed approximately three weeks after Plaintiff's incarceration.

The towing was conducted without a warrant, without probable cause, and in the absence of any exigent circumstances. The vehicle was located on government-controlled property, posed no immediate hazard, and could have been secured or held without removal.

No inventory search was conducted, and no written justification or documentation was created to support the seizure. The location of the vehicle and its removal were not recorded in Plaintiff's booking or property records.

Following the towing, neither Plaintiff nor his family were provided any notice identifying the towing company, the location of the vehicle, or the procedures required for recovery. As a result, Plaintiff's family was forced to contact multiple towing companies in an attempt to locate the vehicle.

By the time the vehicle was located, it had accumulated approximately $2,200 in towing and storage fees and required a battery replacement due to prolonged impoundment. The excessive and compounding fees effectively deprived Plaintiff of meaningful access to his property.

The warrantless towing and impoundment of Plaintiff's vehicle under these circumstances constituted an unreasonable seizure in violation of the Fourth Amendment.

Additionally, Defendant's failure to provide adequate pre-deprivation notice, meaningful opportunity to comply, or prompt and adequate post-deprivation procedures to locate and recover the vehicle constituted a deprivation of property without due process of law in violation of the Fourteenth Amendment.

Defendants had less intrusive alternatives, including allowing a third party to retrieve the vehicle and impound on-site.

The complete absence of any record identifying the towing, location, or disposition of Plaintiff's vehicle is inconsistent with the basic recordkeeping and accountability requirements imposed by TCI standards and reflects not mere negligence, but a systemic failure to implement constitutionally required safeguards.

Defendant Cheeks acted intentionally, recklessly, or with deliberate indifference to Plaintiff's clearly established constitutional rights, and his conduct directly and proximately caused Plaintiff's damages, including loss of use of the vehicle, towing and storage costs, and other financial harm.

## VI. INJURIES

Plaintiff suffered physical injury, including arm trauma resulting from the June 2025 assault incident, with ongoing pain and nerve-related symptoms affecting use and function of the affected arm.

Plaintiff suffered emotional distress and mental anguish resulting from the cumulative conditions of confinement, including prolonged deprivation of access to legal materials, reading materials, and meaningful grievance procedures.

Plaintiff experienced anxiety, frustration, and emotional harm arising from interference with legal mail and denial of confidential attorney communication during the pendency of court proceedings.

Plaintiff also suffered loss of liberty in the form of prolonged detention resulting from the inability to timely pursue legal relief.

Plaintiff also suffered loss of property, including approximately $2,200 in towing and impound fees, as well as loss of use of his vehicle while in custody.

As a result of Defendants' conduct, Plaintiff endured pain and suffering, emotional distress, and ongoing effects from the conditions and injuries described herein.

## VII. PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court enter judgment in his favor and award appropriate relief as follows:

1. Compensatory damages for physical injury, including arm trauma and ongoing pain and nerve-related symptoms, as well as resulting pain and suffering;

2. Compensatory damages for emotional distress and mental anguish arising from the cumulative conditions of confinement, including deprivation of access to legal materials, reading materials, and meaningful grievance procedures;

3. Compensatory damages for constitutional injury to legal rights, including interference with legal mail and denial of confidential attorney communication, resulting in emotional harm and prejudice to Plaintiff's ability to prepare for court proceedings;

4. Compensatory damages for property loss, including approximately $2,200 in towing and impound fees and loss of use of Plaintiff's vehicle;

5. Punitive damages against individual Defendants in their personal capacities for conduct undertaken with reckless or deliberate indifference to Plaintiff's constitutional rights;

6. Declaratory relief declaring that Defendants' actions violated Plaintiff's constitutional rights under the First, Fourth, Sixth, and Fourteenth Amendments;

7. Costs and fees pursuant to 42 U.S.C. § 1988, where applicable;

8. Any other relief this Court deems just and proper.


## VIII. JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

**Respectfully submitted,**

**Erik Zeliski (Pro Se)**

4861 Hunt Club Drive

Flowery Branch, GA 30542

404-519-9721

**Date:** 5/6/26